# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

HAYLEY B.,                                )
                                          )
    Plaintiff,                        )
                                          )
       v.                         )    Case No.   1:17-cv-01413-JBM
                                          )
NANCY A. BERRYHILL,                       )
Acting Commissioner of Social Security,   )
                                          )
    Defendant.                        )

## <u>ORDER & OPINION</u>

This social security appeal is before the Court on Plaintiff Hayley B.'s Motion for Summary Judgment (Doc. 12) and Defendant Nancy Berryhill's Motion for Summary Affirmance (Doc. 16). The motions have been fully briefed and are ready for ruling. For the reasons stated below, Plaintiff's motion is GRANTED, and Defendant's motion is DENIED. The final decision of the Commissioner is REVERSED and REMANDED for further consideration consistent with this Opinion and Order.

## I. PROCEDURAL HISTORY

On May 22, 2013, the claimant, Hayley B., applied for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, claiming that she had become disabled as of June 1, 2010. (R. 24). Her date last insured was March 31, 2014. (R. 51). Plaintiff alleges that she is disabled due to severe bipolar I disorder. Bipolar I disorder "represents the modern

understanding of the classic manic-depressive disorder".[1] Bipolar I disorder is marked by manic episodes that may or may not trigger psychosis, and that are typically preceded or followed by hypomanic or major depressive episodes.[2]

The Social Security Administration initially denied Plaintiff's application on August 28, 2013, and again on reconsideration on April 18, 2014. (R. 127-26, 150-51). On May 11, 2014, Plaintiff requested a hearing before an ALJ. (R. 168). On September 25, 2015, the ALJ held a hearing where the Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (R. 24).

On July 21, 2016, the ALJ issued a decision finding that Plaintiff was not disabled, and thus not eligible for disability insurance benefits or supplemental security income. (R. 35). On July 7, 2017, the Social Security Administration Appeals Council denied Plaintiff's request for a review. (R. 1-3). In doing so, it made the ALJ's decision the final decision of the Commissioner of Social Security. Plaintiff then filed her Complaint (Doc. 1) with this Court on September 11, 2017.

## II. CLAIMANT'S FACTUAL AND MEDICAL HISTORY

Plaintiff was born on July 31, 1981, making her 34 years old at the time of the ALJ's decision. (R. 374). Plaintiff quit high school, but later obtained her GED. (R. 803). She sporadically attended college, but did not obtain any certificates or degrees. *Id.* Plaintiff began having mental health problems when she was a teenager, and she

---

[1]      BIPOLAR AND RELATED DISORDERS, DSM LIBRARY, https://dsm.psychiatryonline.org/doi/full/10.1176/appi.books.9780890425596.dsm03 (last visited Aug. 7, 2018).
[2]      BIPOLAR DISORDER, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955?p=1 (last visited Aug. 7, 2018).

was officially diagnosed with bipolar I disorder in 2001. (R. 362). Plaintiff has a history of writing bad checks and theft problems, and as a result, she has been incarcerated twice. (R. 368, 803). Most recently, from November 2012 through April 2013, Plaintiff was incarcerated for stealing money from her former employer. When Plaintiff was released from prison, she filed for disability the following month.

Plaintiff's claimed onset date of disability is June 1, 2010, although the Administrative Record contains few medical records prior to November 2012. In 2001 and 2006, Plaintiff was hospitalized for two or three weeks at St. Mary's in Decatur due to manic episodes with psychosis. (R. 356, 368, 391, 394, 855). Plaintiff testified that in 2001 she was delusional, believing people to be poisoning her food and she took off to Wisconsin. (R. 80). Plaintiff also received outpatient mental health treatment for bipolar disorder between August 29, 2008, and January 28, 2009. (R. 334-40, 854).

When Plaintiff was incarcerated in November 2012, she began receiving mental health treatment through Cermak Health Services of Cook County. During her prison intake session, Plaintiff indicated that she was taking Abilify[3] and Lamictal.[4] (R. 357). She also reported manic and hypermanic symptoms including decreased need for sleep, more talkative, pressure to keep talking, increase in goal-

---

[3] Abilify is used to treat schizophrenia and acute manic and mixed episodes of bipolar disorder. DORLANDS MEDICAL DICTIONARY, https://www.dorlands.com/dorlands/def.jsp?id=118827876 (last visited July 24, 2018).

[4] Lamictal is used as a mood stabilizer in the treatment of bipolar I disorder. DORLANDS MEDICAL DICTIONARY, https://www.dorlands.com/dorlands/def.jsp?id=200011390 (last visited July 24, 2018).

directed activity, and excessive involvement in pleasurable activities. *Id.* She also reported depressive symptoms including depressed mood, anhedonia, and increase in appetite. *Id.* Records indicate that Plaintiff was non-compliant with medication, was depressed/sad, and had poor insight, but that her affect was appropriate, her thoughts were organized, and her demeanor was cooperative. (R. 362).

During an inpatient psychiatric follow-up while incarcerated, Plaintiff indicated that she had not been paranoid or heard voices since 2011. (R. 374). Plaintiff was on her medication, and appeared pleasant, calm, and cooperative but "tearful at times." *Id.* Plaintiff successfully completed numerous group therapy sessions, and worked well with peers and group leaders. (R. 382-83, 411, 423, 428, 430, 435, 440, 442, 444, 460). On other occasions, Plaintiff would report that she had been feeling very depressed and that she often cried. (R. 391). On November 28, 2012, she presented with "worsening depressed mood and inability to sleep," explaining that she wakes up at 2:00 A.M. every night and uncontrollably cries. (R. 393). Plaintiff indicated that she had manic swings where she "spends a lot of money on things, writes bad checks, speeds excessively while driving, and bakes thousands of cupcakes." *Id.* Plaintiff also reported that she has "depressive swings" where she cannot get out of bed for months and gains weight. *Id.* Plaintiff reported that she cannot tell when she is manic so as to take preventative medication. *Id.*

The treating physician noted that Plaintiff's "depression is not well controlled" and her medication prescriptions were increased to help with depression. (R. 396). On December 10, 2012, Plaintiff reported that her depression had improved only a little and that medication was not helping as much. (R. 401). She was placed on a new

medication for depression. On December 18, 2012 and February 1, 2013, she reported feeling better, and presented with no complaints. (R. 404, 425). Plaintiff did report some feelings of depression, and her objective mood was noted as "anxious." (R. 425-26).

In May 2013, Plaintiff underwent a psychological evaluation with the Cook County Mental Health Court. Plaintiff reported being diagnosed with Obsessive Compulsive Disorder and Antisocial Personality Disorder, in addition to Bipolar I Disorder. (R. 802). She reported that she suffered from symptoms of mania that would last for one or two months. *Id.* According to Plaintiff, mania includes feeling very creative, having excessive energy, shopping excessively, and feeling invincible. (R. 802-803). She also reported feeling symptoms of depression, such as crying all the time and struggling to get out of bed. (R. 803). She described her treatment history as "sporadic," with two stints of extended hospital stays and occasional therapy visits that were unhelpful. *Id.*

The examining physician found that Plaintiff's profile was consistent with individuals who are experiencing symptoms of mania and depression, and of a person who feels a great amount of tension and has severe mood swings. (R. 805). The examining physician also noted that Plaintiff "endorsed items that are consistent with those who have atypical perspectives with regard to social norms and traditional rules and boundaries of social behavior." *Id.* The examining physician further found that Plaintiff's emotional state ranges from depressed to manic "for much of the time and in many situations." *Id.* Test results indicated that Plaintiff was "particularly distressed and likely to engage in negative behaviors in situations involving social

demands and in situations that lack structure." *Id.* "Such situations exacerbate her anxiety and overwhelm her ability to cope." *Id.*

Plaintiff was diagnosed with "Bipolar I Disorder, Most Recent Episode Depressed, Severe without Psychotic Features." (R. 806). The examining physician found that diagnoses supported by Plaintiff's "experience of significant periods of abnormally and persistently elevated and expansive moods [] (lasting more than one week)." *Id.* The diagnoses was also supported by Plaintiff's report of a depressed mood lasting more than two weeks, while on other occasions feeling more talkative than usual, excessive involvement in pleasurable activities, and increased goal-directed activities. *Id.* The physician noted that the mood disturbances cause significant distress in Plaintiff's social and occupational functioning. *Id.* The examining physician recommended individual and group therapy and skill-building interventions, such as coping mechanisms, mood management, and conflict resolution. *Id.*

On August 6, 2013, Dr. Mark Iszak, Psy. D., and Julie List. M.A., a licensed clinical psychologist, issued a statement noting that they had been treating Plaintiff in hour-long weekly individual psychotherapy since May 2013. (R. 849). Dr. Iszak stated that Plaintiff "has a history of bi-polar and obsessive compulsive disorder diagnoses. She has been psychiatrically hospitalized several times, mostly for manic episodes." *Id.* He noted that Plaintiff struggles to maintain medication compliance, which is common with psychiatric patients. *Id.* Dr. Iszak explained that Plaintiff's disorders affect her social, financial, and vocational abilities. Specifically, she has been able to find sporadic employment, but then stress followed by manic episodes

6

"cause[s] her to discontinue her employment." *Id.* Plaintiff reported that her then-compliance with medication—for ten months—was the longest she had ever been on medication consistently. *Id.* Dr. Iszak expressed that he supported Plaintiff's claim for disability. *Id.*

On July 22, 2013, Dr. Slawomir Puszkarski conducted a psychiatric evaluation. (R. 862). Dr. Puszkarski noted that Plaintiff was stable on her medication with mild symptoms, but that she is a compulsive shopper. *Id.* Plaintiff denied symptoms of depression, anxiety, or hallucinations. *Id.* Dr. Puszkarski described Plaintiff's mental status as having no gross abnormalities, that her mood was euthymic with no signs of depression or manic process, and as having no thought disorder. (R. 863). She was again diagnosed with Bipoloar I, Most Recent Episode Manic, Severe without Psychotic Features. *Id.*

Dr. Puszkarski saw Plaintiff for a follow-up on October 30, 2013, and characterized Plaintiff's behavior as stable and "uneventful." (R. 866). Plaintiff denied any psychiatric problems, and Dr. Puszkarski again noted that Plaintiff's mental status was euthymic with no signs of depression or elevation. *Id.*

On August 23, 2013, state-agency, non-examining, psychological consultant Lionel Hudspeth, Psy.D., assessed Plaintiff's mental impairments as "non-severe." (R. 114-116). Dr. Hudspeth found that Plaintiff had no restriction of activities of daily living, only mild difficulties in maintaining social functioning, and only mild difficulties in maintaining concentration, persistence, or pace. (R. 115).

Dr. Jeffrey Teich treated Plaintiff between October 2013 and March 2014. Dr. Teich reported that Plaintiff consistently appeared depressed and anxious, and that

she often reported experiencing abnormally elevated and irritable moods. (R. 878-884). On January 23, 2014, Plaintiff reported that she was feeling a lot of pressure because her social security was denied; she "started thinking ab[ou]t shoes again," and "sold blood so I c[oul]d get new shoes." (R. 882). She said she had an increased desire to spend money, impaired concentration, and insomnia. *Id.*

On February 17, 2014, Dr. Teich assessed Plaintiff as "very mildly manic," and increased her medication dosage. (R. 885). On March 5, 2014, Plaintiff reported feeling slightly manic, a less need for sleep, talkative, distracted, and having impaired concentration. (R. 886). Dr. Teich assessed Plaintiff as "stable," but with a number of symptoms remaining in mild form. (R. 887).

In his final assessment, Dr. Teich concluded that Plaintiff manifested symptoms of anhedonia, decreased energy, difficulty concentrating/thinking, appetite disturbance, psychomotor agitation or retardation, feelings of guilt or worthlessness, and thoughts of suicide. (R. 892). He also concluded that she manifested manic symptoms such as hyperactivity, inflated self-esteem, involvement in activities with high probability of painful consequences that are not recognized, hallucinations, delusions or paranoid thinking, and pressure of speech. *Id.*

Dr. Teich noted that Plaintiff is "somewhat wary and isolative," "very anxious with groups," "easily engages in conflicts," "does not tolerate workplace demands," "mostly homebound will buy groceries and go to library." (R. 890). He stated that Plaintiff's illness restricts her daily activities and impacts her ability to sustain concentration, persistence, pace, and attention resulting in frequent failure to complete tasks because she is too tired, has racing thoughts, is very compulsive, and

engages in high risk behavior when manic. (R. 891-92). Dr. Teich concluded that Plaintiff could not work in a competitive work setting because she is mercurial, unreliable, and unrealistic. *Id*. He further stated that her prognosis is stable, but that she had no profound improvement and that she would never work. *Id*.

On April 15, 2014, state-agency consultant Dr. Donald Henson, Ph.D., considered Plaintiff's claim on reconsideration. (R. 128). Dr. Henson noted that Plaintiff was having difficulties taking her medications, and that she expressed needing assistance and reminders with taking her medication. (R. 129). Like Dr. Hudspeth, Dr. Henson also assessed Plaintiff's mental impairments as non-severe. (R. 134). Dr. Henson believed Dr. Teich's opinion to "contain inconsistencies, rendering it less persuasive," and noted that Dr. Teich's opinion was "not supported by the objective findings." (R. 136).

On November 21, 2014, Dr. Laurie Benton, Psy. D., issued a discharge report for Plaintiff after she attended 11 sessions at The Chicago School Forensic Center. (R. 1022). Dr. Benton diagnosed Plaintiff with Bi-Polar Disorder, Most recent Episode Manic, In Partial Remission. *Id*. Dr. Benton noted that Plaintiff met all treatment goals and learned how to better manage her illness. *Id*.

In August 2015, Erin L. White, M.A., a licensed professional counselor, conducted a mental health assessment of Plaintiff and diagnosed her with Bipolar I, most recent episode depressed, severe without psychotic features. (R. 1026). Ms. White noted that Plaintiff had history of erratic behavior, typically surrounding spending large amounts of money without intent to do so. (R. 1032). Ms. White noted that Plaintiff has been arrested twice for stealing large sums of money to fuel her

habit. *Id.* During these episodes, Ms. White noted that Plaintiff has "very little awareness of her actions, characterizing them as frantic and unfettered." *Id.* Ms. White recommended treatment. *Id.*

Plaintiff was re-matched with Rebecca Stanton, M.A., a licensed professional counselor. (R. 1057). Ms. Stanton reported that Plaintiff was experiencing a manic episode when she assessed Plaintiff on January 8, 2016. *Id.* Ms. Stanton described Plaintiff as speaking rapidly and irrationally. *Id.* Ms. Stanton stated that, while Plaintiff was making progress, she was not currently in a stable position for employment as of March 2016. *Id.*

### III. THE HEARING BEFORE THE ALJ AND THE ALJ'S DECISION

On September 25, 2015, Plaintiff had a hearing before the ALJ. (R. 42-109). During the hearing, the ALJ sought testimony both from Plaintiff and a VE. (R. 55-109).

Plaintiff testified that she was currently living with her parents and ten-month old son. (R. 56). She explained that she is not the primary caretaker of her son; her mother and his father are. *Id.* Plaintiff stated that her mental health problems started when she was a teenager, and she would "just take off and hide" when she was 15 or 16 years old. (R. 79). She described an instance when she was 16 where she watched MTV and was persuaded by the DJ to go to New York. *Id.*

As for her vocational background, Plaintiff testified that she did not work at all in 2002 or 2003 because she was "in really bad shape." (R. 82). She last worked in 2012 for five or six months at Inner Coastal Realty Services in Florida, until she was extradited to Illinois for embezzlement from her former employer. (R. 57-59). At that

full-time position, she only answered the phone and was situated in the office by herself. (R. 60-61). She testified that her boss commented on her inability to stay on task as-assigned. (R. 61).

Prior to that, she worked at Inner Genie as a full-time receptionist. (R. 61). She left that job because she stole from them. She knew she was going to get caught so she left "about a week before they discovered it". (R. 63).

Before Inner Genie, she worked at Najib Pizza for a brief time as part of a jail work-release program. (R. 63-64). She answered the phone, took orders, and managed pizza delivery drivers and to some extent the kitchen staff. (R. 64-65). She left that job because she and the owner "fought a lot," and Plaintiff had a hard time getting along with him. (R. 65).

She testified that she jumped around jobs in her early adult years. In 2001, she worked at Macy's "for one day." (R. 68). In 2004, she worked at Hobson Family Medical Associates as a receptionist for a few months. (R. 67). In 2006, she worked as a telephone operator for three weeks. (R. 69).

Once she was released from prison in 2013, she was in mental health court until October 2014 when she graduated. (R. 58). Since graduating mental health court, she explained that she has made minimal effort looking for receptionist jobs online but "never really venture[s] out of the house much." (R. 59). Plaintiff testified that she believes she cannot work because she gets stressed out and loses touch with reality. (R. 72). For example, she described an instance when she worked at Inner Genie that instead of answering the phones as was required, she sat at work thinking

about how a wall needed a "picture," so she "spent an entire week and not just at work, but at home . . . going to Kinkos and trying to get this picture . . . ." (R. 72).

During the hearing, when asked how she was treating her mental health condition, she said she was seeing a doctor when she got pregnant, but was "losing him because of the insurance issues." (R. 72). Her doctor had advised her not to take medication while she was pregnant or breast feeding. (R. 73). Her doctor also advised her against going back to work because it was too much pressure for her. (R. 88). She lives in a rural area, with only one available psychiatrist, so it is difficult to get appointments. (R. 73). She went to counseling, and she got back on medication after she had her son. *Id.*

Plaintiff testified that since being back on medication, she still feels depressed. (R. 74). She also struggles with thyroid problems which make her tired. (R. 75). Plaintiff further testified that she has had problems with treatment compliance, but she thinks she is more compliant now and that she is more motivated to stay compliant. (R. 76). When asked what she does in a normal day, Plaintiff described doing laundry, but that she was "shut down for the last couple of weeks." (R. 77-78). She "stayed in bed a lot" and stated that getting out of bed is very hard for her. *Id.* Plaintiff expressed that many people help her raise her child, and that she often feels overwhelmed in parenting. (R. 78).

At the hearing, Plaintiff illustrated various instances of delusional thoughts. She described a 2001 incident where she was hospitalized for psychosis because she took off and believed people were poisoning her food. (R. 80). She was very paranoid, "out buying things." *Id.* Plaintiff explained that she sometimes gets in moods where

she buys "collections of weird things," like copious amounts of hair products and baked goods. (R. 80-81). She described another incident where she purchased unbleached coffee filters and different kinds of coffee and a coffee grinder, even though she does not drink coffee. (R. 81). Most notably, she testified to a very recent bout of delusional thoughts where she "spent a good amount of time thinking that" she was Jewish and she "was going to all the holidays," despite not being Jewish. (R. 80).

When asked what caused her stress in a work environment, she responded that she is not comfortable being around people much at all. (R. 84). She explained that she kicked most people out of her life because she is afraid that something bad will happen. (R. 84). Plaintiff also explained that she has trouble completing tasks that she starts. (R. 82). She explained that tasks "end[] up being multiple projects and then [she][] doesn't get anything done." (R. 82). She was tearing up during the hearing and had to take a break. (R. 73).

The examination of the VE by the ALJ was fairly brief. The ALJ posed two hypotheticals to the VE. She first posed: "Assume if you would a person of claimant's age, education, and work experience who can perform work at all exertional levels as defined by the regulations. In addition, this person is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions with few, if any, workplace changes." (R. 92). The VE said Plaintiff could work as a dishwater, a hotel housekeeper, and an

order picker. (R. 93). A dishwasher is medium work, with an SVP[5] of 2; a hotel housekeeper is light work, with an SVP of 2; and an order picker is medium work, with an SVP of 2.

The ALJ posed a second hypothetical with further restriction: "in addition [to the restrictions in the first hypothetical], this person is limited to only occasional interaction with the public and occasional interaction with supervisors." (R. 93). The VE responded that the individual could work the same three jobs. *Id.* The VE explained that the workplace tolerance for off-task behavior at those jobs was no more than ten percent, and less than one day per month as the tolerance for absences. *Id.* The ALJ's examination ended there.

Plaintiff's attorney proceeded to ask the VE questions. The VE clarified that she did not believe the jobs of dishwasher, hotel housekeeper, or order picker were "fast-paced production" jobs because they were not assembly line jobs; however, she agreed with Plaintiff's attorney that every job has production requirements demanded by a particular employer. (R. 95-97). The VE explained that a dish washer just has to keep up, get all the dishes done. (R. 98). The VE agreed that an employee who could not meet production requirements (whether fast-paced or not) could not sustain work activity, regardless of whether the job is considered simple, routine, and repetitive. (R. 97-98). The VE also agreed that if an employee's "mind wanders because they have bi polar illness and they'd be unable to stay on task" more than

---

[5] SVP is the specific vocational preparation time rating that the U.S. Department of Labor assigns to each occupation listed in the Dictionary of Occupational Titles. Unskilled work corresponds to an SVP of 1 or 2; semi-skilled work to an SVP of 3 or 4; and skilled work to an SVP of 5 to 9. SSR 00-4p, 2000 WL 1898704.

ten percent of the time, that individual could not sustain work activity. (R. 100). The VE also agreed that crying spells and mental illness breaks are not appropriate at work. (R. 103).

On June 21, 2016, the ALJ denied Plaintiff's application. First, the ALJ found that Plaintiff engaged in substantial gainful activity during April 2012 and October 2012 when she worked at Inner Coastal Realty in Florida and earned $12,760. (R. 26). She found that Plaintiff did not engage in substantial gainful activity subsequent to October 2012. (R. 27). She found that Plaintiff had a severe impairment: affective disorder (bipolar I with obsessive compulsive disorder). *Id.* The ALJ concluded that the impairment was severe in that it causes more than minimal limitations in the claimant's ability to perform basic work-related activities.

The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P. Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (R. 27). The ALJ concluded that Plaintiff has a "residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she can perform simple, routine and repetitive tasks, in a work environment free of fast paced production requirements, involving only simple, work-related decisions, with few, if any, workplace changes; occasional interaction with the public, and occasional contact with supervisors." (R. 29). She believed Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent, and

that Plaintiff left her job in Illinois just to escape criminal prosecution for embezzlement. (R. 31).

The ALJ accorded "partial weight" to the opinions of Drs. Hudspeth, Henson, and Teich. (R. 31-32). She accorded just "some weight" to Dr. Iszak and Ms. List's statement. (R. 32). Finally, she gave "little weight" to Ms. Stanton's observations. (R. 33).

The ALJ held that given Plaintiff's residual functional capacity, these limitations exceed the demands of her past relevant work. (R. 34). However, the ALJ held that Plaintiff was not disabled because she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy: (1) Dishwasher; (2) Hotel Housekeeper; and (3) Order Picker. (R. 35).

## LEGAL STANDARDS

### I.  DISABILITY STANDARD

To qualify for DIB and/or SSI under the Social Security Act, claimants must prove that they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). Additionally, the impairment must be of a sort "which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). With respect to a claim for a period of disability and disability insurance benefits, claimants must also show that their earnings record has acquired sufficient quarters of coverage to accrue disability insurance benefits and that their disability began on or before the date that insurance coverage ended. 42 U.S.C. §§ 416(i)(3), 423(c)(1)(B).

The Commissioner engages in a factual determination to assess claimants' abilities to engage in substantial gainful activity. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). To do this, the Commissioner uses a five-step sequential analysis to determine whether claimants are entitled to benefits by virtue of being disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1); *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made as to whether the claimant is presently involved in any substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in such activity, the Commissioner then considers the medical severity of the claimant's impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments meet the twelve-month duration requirement, the Commissioner next compares the claimant's impairments to a list of impairments contained in Appendix 1 of Subpart P of Part 404 of the Code of Federal Regulations and deems the claimant disabled if the impairment matches the list. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments do not match the list, then the Commissioner considers the claimant's Residual Functional Capacity ("RFC")[6] and past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If claimants are still able to perform their past relevant work, then they are not disabled and the inquiry ends. *Id.* If they are unable to perform their past relevant work, then the Commissioner considers the claimants' RFC, age, education, and work experience to see if they can transition to other work. *Id.* §§

---

[6] Residual Functional Capacity is defined as "the most [claimants] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

404.1520(a)(4)(v), 416.920(a)(4)(v). If a transition is not possible, then the claimant is deemed disabled. *Id.*

The plaintiff has the burden of production and persuasion on the first four steps of the Commissioner's analysis. *McNeil*, 614 F.2d at 145. However, once the plaintiff shows an inability to perform any past relevant work, the burden shifts to the Commissioner to show an ability to engage in some other type of substantial gainful employment. *Id.* (citing *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 861 (7th Cir. 1978)).

## II.  STANDARD OF REVIEW

The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). "The standard of review that governs decisions in disability-benefit cases is deferential." *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). When a claimant seeks judicial review of an ALJ's decision to deny benefits, this Court must only "determine whether [the ALJ's decision] was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence, 'although more than a mere scintilla of proof, is no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) (citations omitted).

To determine whether the ALJ's decision is supported by substantial evidence, this Court will review the entire administrative record, but will not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own

judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). While this Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," he need not address every piece of evidence. *Id.* at 872. The Court will remand the case only where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## DISCUSSION

Plaintiff raises numerous issues in her Memorandum in Support of Reversing the Decision of the Commissioner of Social Security. (Doc. 13). Plaintiff argues that (1) substantial evidence does not support the ALJ's mental RFC assessment; (2) the ALJ erred in her evaluation of the opinions of Plaintiff's treating psychiatrist, Dr. Teich; and (3) the ALJ erred in her assessment of Plaintiff's subjective allegations according to SSR 16-3p.

### A. THE ALJ ERRED IN FAILING TO GIVE CONTROLLING WEIGHT TO THE OPINIONS OF PLAINTIFF'S TREATING PHYSICIAN

Plaintiff complains that the ALJ afforded only "partial weight" to the opinion of Plaintiff's treating psychiatrist (who treated her for six months), but did not adopt any of the limitations in that opinion when the ALJ determined Plaintiff's RFC.[7] The ALJ accorded "partial weight" to the state-agency, non-examining consultants, Drs. Hudspeth and Henson, as well as to Plaintiff's treating psychiatrist, Dr. Teich. (R. 31-32). The ALJ also accorded just "some weight" to Dr. Iszak and Ms. List's

---

[7] Plaintiff also argues in a separate section of her brief that the ALJ erred in her evaluation of the opinions of Dr. Teich. As both arguments are intertwined, the Court will address both arguments in this portion of the opinion.

19

statement (both of whom treated plaintiff on a weekly basis for three months) and only "little weight" to Ms. Stanton's observations (who treated plaintiff intermittently for three months). (R. 32-33).

Under the "treating physician" rule, "a treating physician's opinion is entitled to 'controlling weight' if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (quoting *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir.2010)). "An ALJ must offer good reasons for discounting a treating physician's opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (quotation omitted). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

As to Dr. Teich's opinion, the ALJ noted that

[w]hile the record reflects that claimant has some limitations, Dr. Teich's treatment notes contradict his opinion to some extent. Specifically, it was noted that clamant has excellent compliance with only mild to moderate symptoms. Moreover, on the date of the opinion, Dr. Teich noted that claimant is stable and her symptoms are mild. Thus, his assessment that claimant "will never work" is rather overstated and inconsistent with the overall record, including his own notes, and is not given controlling weight. Nevertheless, it suggests that claimant requires unskilled, low stress work with limited public

engagement to maintain her stability. The above stated residual functional capacity contains such limitations.

(R. 32).

The ALJ's reasoning that Dr. Teich's opinion was "overstated and inconsistent with the overall record" is not sound, and she should have afforded his opinion controlling weight. The ALJ cherry-picked notes from Plaintiff's "good days," such as her final assessment day, to conclude that Dr. Teich's ultimate opinions were overstated. As the Seventh Circuit has explained, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Dr. Teich is a Psychiatrist and he treated Plaintiff for several months. Plaintiff consistently reported to Dr. Teich feeling abnormally elevated, irritable, and depressed moods. (R. 878-884). Dr. Teich noted that she presented a big risk for noncompliance with medication, and more intense and possibly unremitting episodes. (R. 878). For example, on January 23, 2014, Plaintiff reported that she was feeling a lot of pressure because her social security was denied; she stated that she was thinking about shoes a lot and that she sold blood just so she could buy shoes. (R. 882). She said she had an increased desire to spend money, impaired concentration, and insomnia. *Id.* On February 17, 2014, Dr. Teich assessed Plaintiff as "very mildly manic," with an anxious and ecstatic mood, and he increased her medication dosage. (R. 885). On March 5, 2014, Plaintiff reported feeling slightly manic, a less need for sleep, talkative, distracted, and having impaired concentration. (R. 886). Dr. Teich noted that a number of her symptoms remained in mild form. (R. 887).

Dr. Teich drafted a Mental Disorder Report, in which he concluded that she manifested persistent symptoms of anhedonia, decreased energy, difficulty concentrating and thinking, appetite disturbance, psychomotor agitation or retardation, feelings of guilt or worthlessness, and thoughts of suicide. (R. 892). He also concluded that she manifested manic symptoms such as hyperactivity, inflated self-esteem, and involvement in activities with high probability of painful consequences that are not recognized, hallucinations, delusions or paranoid thinking, and pressure of speech. *Id.*

Dr. Teich noted the following "causes" and "triggers" of her symptoms: "somewhat wary and isolative," "very anxious with groups," "easily engages in conflicts," "does not tolerate workplace demands," "mostly homebound will buy groceries and go to library." (R. 890). He stated that Plaintiff's illness restricts her daily activities and impacts her ability to sustain concentration and attention resulting in frequent failure to complete tasks because she is too tired, has racing thoughts, is very compulsive, and engages in high risk behavior when manic. (R. 891). Based on his observations and assessments, he concluded that Plaintiff would never sustain gainful work, even if she was stable at times, because she is mercurial, unreliable, and unrealistic. (R. 891).

Essentially, Dr. Teich's notes paint a picture of a claimant who, while stable at times, will repeatedly experience ups and downs because of her severe mental illness and as a result, cannot sustain full-time employment and will never show profound improvement. The Seventh Circuit has addressed many cases similar to this one, and admonished administrative law judges for assuming claimants with bipolar

disorder can sustain full-time employment just because they occasionally have better days when they are medication compliant. *See Bauer v. Astrue,* 532 F.3d 606, 609 (7th Cir. 2008) (ALJ showed "lack of understanding of bipolar disorder" where it gave "little weight" to treating physician's opinion that claimant could not work because the physician's notes also contained "hopeful remarks"); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) (the ALJ "thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic.").

Contrary to the ALJ's decision, Dr. Teich's findings are supported by the overall record and by all of Plaintiff's consistent treating medical professionals. While incarcerated, Plaintiff would report manic and hypermanic symptoms including decreased need for sleep, more talkative, pressure to keep talking, increase in goal-directed activity, and excessive involvement in pleasurable activities. (R. 357). Records indicate that Plaintiff was non-compliant with medication, was depressed/sad, and had poor insight, but also that her affect was appropriate, her thoughts were organized, and her demeanor was cooperative. (R. 362). Sometimes, Plaintiff was doing well on her medication, and appeared pleasant, calm, and cooperative. *Id.* She even successfully completed group therapy sessions and worked well with peers and group leaders. (R. 382-83, 411, 423, 428, 430, 435, 440, 442, 444, 460). But then Plaintiff would report that she had been feeling very depressed and that she would wake up and uncontrollably cry. (R. 391, 393). On December 10, 2012, Plaintiff reported that her depression had improved only a little and that medication

was not helping. (R. 401). And then on December 18, 2012, she reported feeling better, and presented with no complaints. (R. 404).

In May 2013, Plaintiff underwent psychological evaluation with the Cook County Mental Health Court. Consistent with Dr. Teich's opinion, the examining physician found that Plaintiff's profile was consistent with individuals who are experiencing symptoms of mania and depression, and of a person who feels a great amount of tension and has severe mood swings. (R. 805). The examining physician also noted that Plaintiff "endorsed items that are consistent with those who have atypical perspectives with regard to social norms and traditional rules and boundaries of social behavior." *Id.* The examining physician further found that Plaintiff's emotional state ranges from depressed to manic "for much of the time and in many situations." *Id.* Test results indicated that Plaintiff was "particularly distressed and likely to engage in negative behaviors in situations involving social demands and in situations that lack structure." *Id.* "Such situations exacerbate her anxiety and overwhelm her ability to cope." *Id.* The examining physician noted that Plaintiff's bipolar I diagnosis was supported by her reports of a depressed mood lasting more than two weeks, while on other occasions feeling more talkative than usual, excessive involvement in pleasurable activities, and increased goal-directed activities. *Id.* The physician noted that the mood disturbances cause significant distress in Plaintiff's social and occupational functioning. *Id.*

Dr. Iszak and Julie List treated Plaintiff for three months during hour-long, weekly, individual psychotherapy sessions. (R. 849). The ALJ again cherry-picked "good" evidence from that statement. The ALJ took from the statement that "with

medication compliance and a less stressful environment," Plaintiff was capable of returning to work. But Dr. Iszak specifically noted that Plaintiff struggles with medication compliance and that her psychiatric disorders "affect her social, financial, and vocational abilities." (R. 849). Specifically, Dr. Iszak explained that Plaintiff over-extends herself when she is doing well, allowing her to find work. However, Plaintiff's work history is "brief and sporadic" because "stress is followed by manic episodes which cause her to discontinue her employment." *Id.* Dr. Iszak ended his statement with, "I am writing **in support of Hayley's claim** for assistance." *Id.* (emphasis added).

Finally, Plaintiff's licensed professional counselor, who treated her for about three months, agreed that while Plaintiff was making progress, she was not currently in a stable position for employment as of March 22, 2016—just four months before the ALJ's decision. (R. 1057-58).

Significantly, the ALJ afforded state-agency non-examining consultants the same "partial weight" as she did Dr. Teich's opinions. Dr. Hudpseth, a psychiatrist, and Dr. Henson, Ph.D., assessed Plaintiff's mental impairments as non-severe and opined that Plaintiff was not disabled. (R. 31). As just explained, the opinions of Drs. Hudspeth and Henson are *not* supported by the record; not a single examining physician or mental health therapist that actually treated Plaintiff agrees with Drs. Hudspeth and Henson. Accordingly, the ALJ was not entitled to deny controlling weight to Plaintiff's treating physician where the physician's opinions were supported by the overall record. *See Barnes v. Colvin*, 80 F. Supp. 3d 881, 891 (N.D. Ill. 2015) (explaining that an ALJ is only allowed to deny controlling weight to a treating

physician when his report is at odds with a *consulting physician*, as opposed to a non-examining state-agency physician). Based on these shortcomings, the ALJ's consideration of Dr. Teich's assessment is unsatisfactory and requires remand.

## B. THE ALJ ERRED IN FAILING TO ORIENT THE VE TO PLAINTIFF'S LIMITATIONS IN CONCENTRATION, PERSISTENCE AND PACE

Plaintiff points out more issues with the ALJ's decision that warrant discussion. The first hypothetical the ALJ posed at the hearing asked the VE to consider what jobs would be available to an individual that is "limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions with few, if any, workplace changes." (R. 92). Under that hypothetical, the VE stated that Plaintiff could work as a hotel housekeeper, order picker, or dishwasher. (R. 92-93). The ALJ then posed a second hypothetical to the VE, further limiting that individual "to only occasional interaction with the public and occasional interaction with supervisors." (R. 93). The VE responded that the same jobs would be available, but that the workplace tolerance for off-task behavior in those jobs would be no more than 10% of the actual workday excluding lunch and breaks, and no more than one absent day per month. *Id.* The VE explained that crying spells and bouts of mental illness would not be tolerated. (R. 103).

The ALJ *did not* ask, and the VE did not consider, Plaintiff's deficiencies of concentration, persistence and pace. An ALJ is required "to orient the VE to the totality of a claimant's limitations," which must include deficiencies of concentration, persistence and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). There are two exceptions to this rule. First, where the record shows

that the VE independently reviewed the claimant's medical records, but that exception does not apply where the "ALJ poses a series of increasingly restrictive hypotheticals to the VE, because in such cases we infer that the VE's attention is focused on the hypotheticals and not on the record." *Id.*; *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) (ALJ could not assume that the vocational expert included all limitations in his assessment because the ALJ asked a series of hypothetical questions with increasingly debilitating limitations). Second, where it is "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.*

The first exception does not apply here. The ALJ here posed a series of increasingly restrictive hypotheticals, none of which contained explicit references to persistence, pace and concentration, and no evidence exists that the VE reviewed Plaintiff's medical history. See R. 89 (explaining that she reviewed claimant's vocational background).

The second exception also does not apply here. The Commissioner argues that the ALJ accounted for Plaintiff's limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine, repetitive tasks. (R. 10). But that is incorrect. The Seventh Circuit sometimes lets an ALJ's hypothetical omitting the terms "concentration, persistence and pace" stand when the hypothetical restricted the claimant to <u>low-stress work</u>. *See Johansen v. Barnhart,* 314 F.3d 283, 285, 288-89 (7th Cir.2002) (ALJ's hypothetical okay where it described "repetitive, low-stress" work, a description that excluded positions likely to trigger symptoms of the panic disorder that lay at the root of the claimant's moderate limitations on concentration,

persistence and pace). But here, the ALJ did not mention "low-stress" in the hypotheticals she posed. And in most cases, only employing terms like "simple, repetitive tasks"—like the ALJ did here—will not exclude from the VE's consideration those positions that present significant problems of concentration, persistence, and pace. *O'Connor-Spinner*, 627 F.3d at 620; *Stewart v. Astrue,* 561 F.3d 679, 684-85 (7th Cir. 2009) (limiting hypothetical to simple, routine tasks did not account for limitations of concentration, persistence, and pace); *Craft v. Astrue,* 539 F.3d 668, 677–78 (7th Cir.2008) (restricting hypothetical to unskilled work did not consider difficulties with memory, concentration or mood swings); *Young*, 362 F.3d at 1004 (limiting hypotheticals to "simple, routine, repetitive, low stress work" "made short shrift of Young's social and temperamental impairments"). In fact, during examination of the VE, Plaintiff's attorney specifically pointed out, and the VE agreed, that regardless of whether a job is "simple, routine, and repetitive work," an employee needs to stay on task and maintain productivity and standards of the work in order to sustain employment. (R. 98, 100).

The ALJ's error in failing to orient the VE to limitations of concentration, persistence, and pace is harmful in a case such as this one where the overall record shows that Plaintiff severely struggles with stress, staying on task, and work place demands. Plaintiff's vocational record is sporadic and overall unsuccessful. "Where it is established that the claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity." *Kangail*, 454 F.3d at 629. Plaintiff did not work at all in 2002 or 2003 due to her mental illness. (R. 82). In 2001, she worked at Macy's "for one day." (R. 68). In 2004, she worked at Hobson Family

Medical Associates as a receptionist for a few months. (R. 67). In 2006, she worked as a telephone operator for three weeks. (R. 69). She worked at Najib Pizza as an assistant manager as part of a jail work-release program. (R. 63-64). She left that job because she and the owner "fought a lot," and Plaintiff had a hard time getting along with him. (R. 65). She then worked at Inner Genie as a full-time receptionist for a few months. (R. 61). Plaintiff testified that she believes she cannot work because she gets stressed out and loses touch with reality. (R. 72). She described an instance at Inner Genie where she did not answer the phones and instead obsessed about a picture on the wall. (R. 72). She left Inner Genie because she embezzled from them during a manic phase. (R. 63). She last worked in 2012 at Inner Coastal Realty Services for a few months in Florida, until she was extradited to Illinois for embezzlement charges. (R. 57-58). Her boss there commented on her inability to stay on task as-assigned. (R. 61).

Furthermore, Plaintiff's treating physicians and counselors believe that stress triggers her manic phases and that she cannot tolerate workplace demands. Dr. Iszak explained that Plaintiff over-extends herself when she is doing well, allowing her to find work. However, once manic episodes cause stress, she quits work. (R. 849). Dr. Teich noted that Plaintiff is "somewhat wary and isolative," "very anxious with groups," "easily engages in conflicts," "does not tolerate workplace demands," "mostly homebound will buy groceries and go to library." (R. 890). Dr. Teich concluded that Plaintiff's illness impacts her ability to sustain concentration and attention resulting in frequent failure to complete tasks because she is too tired, has racing thoughts, is very compulsive, and engages in high risk behavior when manic. (R. 891). Dr. Teich

concluded that Plaintiff could not work in a competitive work setting because she is mercurial, unreliable, and unrealistic. *Id.* Finally, Ms. Stanton, M.A., believed that Plaintiff was not stable enough to work in March of 2016 because she was likely to buckle under the pressure and get sent back to prison. (R. 1058).

In sum, because the formulation of the hypotheticals given to the vocational expert did not include all limitations supported by medical evidence in the record, remand is appropriate on this issue, as well.

## C. THE ALJ'S EVALUATION OF PLAINTIFF'S SUBJECTIVE SYMPTOMS

Plaintiff argues that the ALJ erred in failing to assess the Plaintiff's subjective allegations according to SSR 16-3p.[8] The Court will only briefly touch on this issue, as remand is already appropriate based on other issues.

Social Security regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those

---

[8] The Social Security Administration recently issued SSR 16-3p in which it determined that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." Social Security Regulation (SSR)4 16-3p, at *2. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities...." SSR 16-3p, at *2.

In evaluating the claimant's subjective symptoms, "an ALJ must consider several factors, including the claimant's daily activities, [her][] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). (citations omitted); *see* SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ believed Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent. The Court disagrees, and it does not need to rehash what it has already said: there is ample evidence in the record, both subjective and objective, that Plaintiff suffers from a severe mental illness and that her symptoms are intense, persistent, and debilitating.

The ALJ also believed Plaintiff left her job in Illinois not because she was mentally ill, but to escape criminal prosecution for embezzlement. (R. 31). The ALJ put too much emphasis on the fact that Plaintiff could work when she was stable on medication and that she could perform some daily activities, like laundry and dishes. As the Seventh Circuit explained, bipolar disorder in particular, "in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease," "may prevent the sufferer from taking her prescribed medicines or otherwise submit to treatment." *Kangail*, 454 F.3d at 629. The ALJ here did not consider the fact that Plaintiff has a history of medication non-compliance, as

well as problems with bad checks, theft, and manic spending, *because* of her mental illness. Instead, the ALJ paints a picture of a criminal who willingly ran away from her most-recent job. That picture is both unfair and ignores the evidence in the record. *See, e.g., id.* (ALJ went too far as to attribute bipolar disorder to substance abuse; "[w]hat is clear is the reverse—that bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms."); *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("The ALJ apparently concluded that Jelinek's symptoms would have remained under control but for an unwillingness to take her medications as directed. But we have often observed that bipolar disorder . . . is by nature episodic and admits to regular fluctuations even under proper treatment. ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."). Furthermore, the Seventh Circuit has repeatedly cautioned that a person's ability to perform some daily activities does not necessarily translate into an ability to work full-time. *See, e.g., Roddy v. Astrue,* 705 F.3d 631, 639 (7th Cir. 2013) (citations omitted).

## CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary Judgment, (Doc. 12), and DENIES the Commissioner's Motion for Summary Affirmance, (Doc. 16). The Court REVERSES the judgment of the Commissioner and REMANDS the case back to the Commissioner for further proceedings consistent with this Opinion and Order.

IT IS SO ORDERED. CASE TERMINATED.


Entered this 9th day of August, 2018


                                        s/ Joe B. McDade
                                    ───────────────────────
                                      JOE BILLY McDADE
                                United States Senior District Judge